## THE ASBURY PARK.

(District Court, E. D. New York. June 7, 1905.)

1. SHIPPING—INJURY TO VESSEL AT DOCK FROM SWELL—NEGLIGENT NAVIGATION OF STEAMER.

A large steamer, proceeding in New York Harbor at such speed that her swell caused the sinking of a schooner a mile away, by striking her against a dock at which she was discharging, *held* liable for the damage caused; it being shown that, either from her construction or the speed with which she was customarily navigated, she was known to be peculiarly liable to cause swells dangerous to other shipping, which required the exercise of unusual care in her navigation.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 345.]

2. SAME—LIABILITY FOR DAMAGES.

It is not a defense to a suit to recover for an injury to a vessel caused by the swell of a passing steamer that other vessels were not injured, or that the one injured might have prevented the injury by taking unusual precautions.

In Admiralty.

Alexander & Ash, for libelant.

De Forest Bros. (R. D. Benedict, of counsel), for claimant.

THOMAS, District Judge. The schooner Annie E. Webb on June 24th, at 12:30 p. m., was properly moored on the south side of

the dock at the foot of Bay Ridge avenue, Brooklyn. The tide was flood, and the weather clear. The pier is about 700 feet long, and is built on piles, which are about 10 feet apart. All the timbers laid on or between the piles are so arranged that their edges do not project beyond the face thereof. The schooner, with a cargo of brick partially discharged at the time of the accident about to be stated, was entirely below the top stringers, and carried fore and aft fenders. About 1:30 p. m. the discharge of her cargo began, and was in progress when the steamship Asbury Park passed outside of the red buoy off Owl's Head, at a distance of about 1 mile from the dock; and her swells caused the port side of the schooner to strike against the dock, whereby two of her planks were broken in. She sank shortly thereafter. The steamer left Rector street at 3:46; her running time to Owl's Head was $16\frac{1}{2}$ minutes; thence to Craven Shoals $12\frac{1}{2}$ minutes; and she arrived at the Highlands at 4:54, thus making the distance of about $20\frac{1}{2}$ miles in an hour and 8 minutes. Her horse power is about 6,000; her length 306, and her beam 51, feet. The steamer was making her usual speed under the conditions existing. While other passing vessels made swells that reached the dock, she caused larger swells. Was she culpably negligent? Her navigators did not insure the safety of other vessels, but were bound to exercise good business prudence, lest her swells cause injury to them. Should they, in the exercise of requisite care, have known that her swells would reach a vessel a mile away, and cause injury? Prior to this her swells are not shown to have caused injury to vessels at this dock, although there was evidence of subsequent injury to a vessel at the same dock from the same cause. Accidents arise from the presence of favoring conditions. A negligent act may be repeated often, and yet meet with no object so situated as to be harmed thereby. It is not always possible to point out why one ship escapes injury from given forces, while another does not. The vessel's shape, the nature of her construction, her strength, her cargo, her relation to the dock, her moorings, among other things, would qualify the effect of swells upon her; and, moreover, apprehension of danger from such swells, and consequent safeguarding of the vessel against them, would avoid or modify injurious effects. Indeed, the government patrol ship Argus, as at the time in question, often trailed from the end of the dock by a line, with some special reference to harm that the Asbury Park, in passing, might cause. Swells of the size and violence disclosed by the evidence, that necessitate such practical care and foresight on the part of vessels using a dock, show some usurpation of the water way by the vessel that causes them. The owners and navigators of the Asbury Park had full opportunity to observe the size, progress, and range of her waves, and to judge of the force of their contact with vessels at either side of a water way. Her capacity for harm, so familiar to other navigators, should not have eluded the notice of her owners or pilot. In the exercise of reasonable care, they should have known what consequences would result naturally from her customary navigation. It often happens that the restraint of the law

is inefficient to check the speed of vehicles using public highways, so that cars, automobiles, carriages, and vessels are often driven at a speed that is in fact negligent, although the watchfulness of those endangered thereby may prevent injury from such negligence. Such operation is wrongful, deprives others of their rights, and imposes upon them greater care than the law demands. In such cases, when injury arises, it is not sufficient answer that person or property had not been injured previously thereby. The reputation of the Asbury Park as a menace to navigation, on account of her swells, fully appears from the evidence; and, even if it be the duty of the court to be oblivious of her frequent summoning to court for injuries arising therefrom, the present record shows sufficiently that there was something in her construction or use, or both, that subjected vessels rightfully in the harbor and adjacent waters to unusual peril. The persons responsible for her navigation were aware, actually or constructively, of her peculiar ability to do injury; and it is concluded that, had they made proper observation or inquiry, they would have discovered that her swells reached the dock in question, and that their size and velocity were calculated to injure vessels moored there.

The libelant should have a decree.